Argued and submitted February 29, affirmed August 28, petition for review allowed October 22, 1996 (324 Or 322)
See later issue Oregon Reports

Dwaine SCHIFFER
and White City Development,
*Respondents,*

*v.*

UNITED GROCERS, INC.,
an Oregon corporation,
*Appellant.*

(94-2411-L-2; CA A87467)

922 P2d 703

David J. Sweeney argued the cause for appellant. With him on the briefs were Paul G. Dodds and Brownstein, Rask, Arenz, Sweeney, Kerr & Grim.

Charles M. Zennache argued the cause for respondents. With him on the brief were R. Scott Palmer and Muhlheim Palmer Zennache & Wade.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Defendant United Grocers, Inc. appeals summary judgment for plaintiffs Dwaine Schiffer and White City Development in an action for declaratory relief. The trial court concluded that plaintiffs were not liable to defendant as co-obligors on a promissory note and were entitled to reasonable attorney fees incurred in litigating that question. We affirm.

The facts are uncontroverted. In 1989, Schiffer and John Gast located property in White City on which to build a grocery store. The property was owned by John and R. J. Batzer. Schiffer, Gast, and the Batzers then formed a partnership, White City Development ("White City"), for the purpose of constructing and operating a grocery store on the property. In order to finance the construction of the store, Schiffer and Gast approached defendant with the following proposal: Defendant would lease the property from White City and, in turn, sublease the property to Schiffer and Gast. The financial strength of defendant, as prime lessee of the property, would enable Schiffer and Gast to secure financing for the construction of the grocery store.

Under the lease between White City and defendant, White City agreed to pay defendant $68,802, which represented the cost of "lease guarantee" insurance that defendant was to purchase, by which defendant would be indemnified if Schiffer and Gast defaulted on the sublease. Specifically:

"45. LESSOR'S INDEBTEDNESS - LEASE INSURANCE: Lessor, [White City Development partnership] hereby acknowledges an indebtedness to Lessee [defendant] in the amount of $68,802 (together with interest thereon as evidenced by the promissory note attached hereto and executed contemporaneously with this lease) representing Lessee's premium for lease guarantee insuring Lessee of the Sublessee's [Schiffer's and Gast's] performance of all obligations set forth under the Lessee's sublease. If such sum is not paid according to its terms, Lessee has the right to assert said sum as a right of set off against any sums due hereunder. If the lease is terminated prior to grant of possession, then this note shall be null and void."

On March 17, 1989, defendant and the partners of White City (Schiffer, Gast, and the Batzers) executed the prime lease. On the same day, White City's partners signed and executed a promissory note in favor of defendant in the amount of $68,802. That note provided, in part:

> "We, jointly and severally, promise to pay to the order of [defendant], at Portland, Oregon, the sum of SIXTY-EIGHT THOUSAND EIGHT HUNDRED TWO AND NO/100 DOL-LARS due and payable at such time as [defendant] under a Lease Agreement dated March 17, 1989 is granted posses-sion of the subject property pursuant to the terms of said Lease Agreement."[1]

Due to an oversight, defendant failed to collect, and White City failed to remit, the $68,802 due under the lease and promissory note; consequently, defendant never purchased the lease guarantee insurance.

---

[1] The promissory note was not a negotiable instrument within the meaning of Article 3 of the Uniform Commercial Code, ORS chapter 73. The definition of "negotiable instrument" at the time the note was executed, *former* ORS 73.1040(1), provided:

> "Any writing to be a negotiable instrument * * * must:
>
> "(a) Be signed by the maker or drawer; and
>
> "(b) Contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by ORS 73.1010 to 73.8050; and
>
> "(c) *Be payable on demand at a definite time*; and
>
> "(d) Be payable to order or to bearer." (Emphasis supplied.)

The note here was not "payable on demand"; nor was it payable "at a definite time." *Former* ORS 73.1090(2) provided:

> "An instrument which by its terms is otherwise payable only upon an act or event uncertain as to time of occurrence is not payable at a definite time even though the act or event has occurred."

Here, the note was "payable only upon an act or event uncertain as to time of occur-rence"—*i.e.*, defendant's assumption of possession of the leased premises, and, thus, was not "payable at a definite time."

In 1993, long after the execution of the promissory note, and shortly after the execution of the Surrender Agreement, discussed below, 143 Or App at 280, ORS chapter 73 was substantially overhauled. *Former* ORS 73.1040 and *former* ORS 73.1090 were repealed, 1993 Or Laws, chapter 545, section 126, and were replaced with the present ORS 73.0104 and ORS 73.0108. The statutory provisions pertain-ing to "discharge and payment" were also revamped. *Compare* ORS 73.0601 *et seq* with *former* ORS 73.6010 *et seq*. *See especially* ORS 73.0605 ("Discharge of endor-sers and accommodation parties.").

Schiffer and Gast operated the grocery store until the business failed in July 1993. Following the failure of the store, Schiffer and Gast entered into a "Surrender Agreement" with defendant. That agreement addressed Schiffer's and Gast's defaults under the sublease and various equipment and inventory loans on open account with defendant. The agreement further provided:

"United agrees to release * * * Gast from all claims, demands, and causes of action arising out of the parties' prior course of dealings and under all open accounts, loans, security agreements, and promissory notes with United."

In July 1993, following the execution of the surrender agreement, defendant notified White City that the $68,802 lease insurance premium had never been paid and requested full payment. In September 1993, defendant again requested payment on the promissory note and stated that it intended to offset $68,802 against the balance of the rent it owed under the prime lease, as contemplated by paragraph 45 of the lease set out above. After receiving no response, defendant notified White City in May 1994 that it would begin to withhold rent under the prime lease.

In June 1994, plaintiffs brought this action seeking, *inter alia*, a declaration that: (1) their joint and several obligations under the March 17, 1989, promissory note were extinguished by defendant's release of their co-obligor, Gast; and (2) consequently, defendant was not entitled to offset amounts allegedly due and owing on the note against amounts it owed White City on the prime lease.

Plaintiffs moved for summary judgment, asserting that defendant had released Gast from his obligations on the promissory note and that, as a matter of law, that release had concomitantly discharged Schiffer's and the Batzers' joint and several obligations on the note. The trial court, relying on the common-law principle that "the release of one releases all," granted plaintiffs' motion. The court subsequently awarded plaintiffs "prevailing party" attorney fees under the terms of the note.

On appeal, defendant argues that allowance of summary judgment was erroneous for two alternative reasons.

First, the Surrender Agreement did not release Gast from his obligations under the promissory note. Second, even if Gast was released, that release did not operate to concomitantly discharge his co-obligors. Defendant also assigns error to the court's award of "prevailing party" attorney fees, arguing that, because that award depended on the summary judgment disposition, it was necessarily erroneous.

■ Defendant's first argument fails. Defendant asserts that the Surrender Agreement, by its terms, dealt only with disputes arising out of the operation of the grocery store— e.g., surrender of inventory, debts, obligations under the sublease—and did not pertain to the prime lease or the promissory note. We disagree. The Surrender Agreement explicitly and unambiguously released Gast from "all claims, demands, and causes of action arising out of * * * all * * * promissory notes with [defendant]." That express language admits to only one reasonable construction: Defendant released Gast from his obligations under the March 17, 1989, promissory note. See Pacific First Bank v. New Morgan Park Corp., 319 Or 342, 347, 876 P2d 761 (1994) (unambiguous contracts must be enforced according to their terms; whether the terms of a contract are ambiguous is, in the first instance, a question of law).

■ Defendant next argues that, regardless of whether the Surrender Agreement relieved Gast's liability on the promissory note, it did not concomitantly release plaintiffs' joint and several liability as co-obligors on the note. Defendant acknowledges that Oregon has historically subscribed to a common-law rule that "release of one co-obligor releases all," but argues that the repudiation of a parallel principle in tort law, as well as considerations of logic and policy, compel its repudiation in contract[2] cases:

"There is no reason * * * to expect that the law applicable to tort cases will not apply equally to contract cases. This is the law of contracts in other states.

"* * * * *

[2] As noted previously, see n 1 above, the promissory note at issue here is not governed by Article 3 of the Uniform Commercial Code, ORS 73.0101 et seq. Accordingly the discussion that follows pertains only to contractual obligations that are not otherwise subject to Article 3.

"Moreover, there is no policy supporting adherence to the common law rule. As noted in *Cranford* [*v. McNiece*, 252 Or 446, 450, 450 P2d 529 (1969)], the rule is based on questionable logic, and not reality.[3] So long as the creditor does not obtain a double recovery, there is no reason why release of one debtor should automatically release all others as well. In addition, there is simply no policy reason for treating contract cases differently from tort cases.

"In short, the common rule of release of one releases all should no longer be followed in contract cases. Under the modern rule that has been applied to tort cases, the key inquiry is whether, in releasing one of the obligors, the creditor intended to release the others as well. * * * Where the issue of the intent of the parties is disputed, summary judgment is inappropriate."

Defendant further emphasizes that the overwhelming trend in other jurisdictions has been to replace the "all or nothing" approach of the original common-law rule with a more qualified analysis that looks to the parties' intent in releasing one of several joint and several co-obligors.[4]

Whatever the substantive merits of defendant's arguments, they fail in two critical respects. First, they do not address the framework for reconsidering common-law rules, prescribed in *G.L. v. Kaiser Foundation Hospital, Inc.*, 306 Or 54, 757 P2d 1347 (1988), and its progeny. *See, e.g., Keltner v. Washington County*, 310 Or 499, 800 P2d 752 (1990); *Heino v.*

---

[3] *Cranford* addressed the effect of a release of one joint tortfeasor on the liability of the other tortfeasor. It did not address contractual liability.

[4] *See, e.g., Lovetro v. Steers*, 234 Cal App 2d 461, 44 Cal Rptr 604 (1965); *Bazine State Bank v. Pawnee Production Service, Inc.*, 245 Kan 490, 781 P2d 1077, 1083 (1989), *cert den* 495 US 932 (1990); *Seafirst Center Ltd. v. Kargianis, Austin & Erickson*, 127 Wash 2d 355, 370, 898 P2d 299 (1994). *Accord Restatement (Second) of Contracts* § 294(1)(b) (where obligee "discharges one promisor * * * co-promisors who are bound by joint and several duties or by several duties are not discharged except to the extent required by the law of suretyship"); 66 Am Jur 2d *Release* § 36 (under "modern view," determination of whether release of one co-obligor releases other co-obligors depends on "(1) the intention of the parties to the release instrument, and (2) whether the injured party has in fact received full compensation"). *See generally* Harold C. Havighurst, *The Effect of a Settlement with One Co-Obligor Upon the Obligations of the Others*, 45 Cornell L Q 1 (1959) (hereafter "Havighurst").

*Harper*, 306 Or 347, 373-74, 759 P2d 253 (1988); *but see Kelt-ner*, 310 Or at 510-13 (Unis, J., dissenting) (criticizing methodology). Under that methodology, Oregon courts cannot discard a well-established common-law rule or doctrine unless the party seeking to change that rule demonstrates

> "(1) that an earlier case was inadequately considered or wrong when it was decided; (2) that surrounding statutory law or regulations have altered some essential legal element assumed in the earlier case; or (3) that the earlier rule was grounded in and tailored to specific factual conditions, and that some essential factual assumption of the rule has changed." *G.L.*, 306 Or at 59 (citations omitted).

Defendant does not pitch its plea for alteration of the common-law rule to any of those bases. Indeed, defendant's "policy"-based arguments are apparently anathema to that methodology. *See, e.g., Keltner*, 310 Or at 509-10 n 6; *Heino*, 306 Or at 370-71.[5]

■     Second, and even more fundamentally, defendant's arguments are addressed to the wrong court. The Oregon Supreme Court first announced the "release of one releases of all" rule during the heyday of contractual formalism, over a century ago,[6] and has never questioned, much less overruled, that precedent. *See Crawford v. Roberts*, 8 Or 324, 325-26 (1880) (release of one obligor on joint and several promissory note operated to discharge co-obligor: "It is a well-settled rule of elementary law that 'a release of one joint maker by the holder * * * will discharge all the joint parties[.]") (quoting *Story on Promissory Notes* § 425; *Chitty on Bills* 314). The

---

[5] In *Keltner*, the court observed:

"This court's admonition in *Norwest v. Presbyterian Intercommunity Hospital*, 293 Or 543, 551-53, 652 P2d 318 (1982), about the inherent limitations in a court's capacity to gauge the weight of competing societal interests dressed up as 'policy considerations' (assuming a court's capacity accurately to identify such interests or considerations in the first place) takes on additional force when there already exists an Oregon common-law rule on the subject, so that the argument is over retention of the rule rather than its initial recognition." 310 Or at 510 n 6 (citing *Heino*).

*Accord* Kenneth J. O'Connell, *Oregon's Common Law Tradition: An Endangered Species*, 27 Will L Rev 197, 225 (1991) (characterizing *Keltner* footnote 6 as a "reaffirmation of the court's skepticism of policy arguments, bordering on nihilism").

[6] *See* Grant Gilmore, *The Death of Contract* at 5-34 (1974); Grant Gilmore, *The Ages of American Law* at 41-67 (1977).

court reiterated that principle most recently, albeit in *dictum*, over 40 years ago. *State v. Cummings*, 205 Or 500, 528, 288 P2d 1036 (1955) ("This state adheres to the common law rule that the release of one of two or more joint debtors discharges all[.] * * * The release of one joint and several obligor releases all[.]" (Citations omitted.)).

Those decisions, however old, are still good—or, at least, binding—law. However tempting it may be to revisit those decisions, applying the *G.L.* methodology,[7] that is not our role. We are not in the business of overruling decisions of the Oregon Supreme Court. Correction,[8] if any, lies elsewhere. We thus conclude that the trial court did not err in entering summary judgment for plaintiffs and in awarding plaintiffs reasonable attorney fees as the prevailing parties under the terms of the parties' promissory note.

Affirmed.

---

[7] *Cf.* Havighurst, note 4, above:

"It has long been the general rule that where a number of obligors are liable on the same obligation, the release of one releases all. That applies both to co-debtors and to joint tortfeasors. Although here and there one may find favorable comment upon the rule, text writers, without notable exception, have expressed the view that the reasons given for it have been inadequate, and it has been subjected at times to severe criticism in judicial opinions. It appears as a survival from an older day when the law for the most part was less concerned, as we think, about giving effect to the intentions of the parties and less sensitive to considerations of fairness in the administration of justice." 45 Cornell L Q at 3.

[8] As we understand *G.L.*, *Keltner, et al*, the principles set out there pertain only to reconsideration or repudiation of well-established common-law rules and do not purport to limit the courts' capacity to engage in interstitial refinement, amplification, or extension of the common law. *Accord* Grant Gilmore, *The Ages of American Law*, note 6 above, at 108 ("The adept of formalism, once he has perfected his model (or borrowed one ready-made from an economist or sociologist), becomes an advocate of stability and an enemy of further change.").